**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1158-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

SUI KAM TUNG, a/k/a
TONY TUNG,

    Defendant-Appellant.

_____

Argued January 20, 2026 – Decided July 2, 2026

Before Judges Natali, Walcott-Henderson and Bergman.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 13-06-0793.

Stephen W. Kirsch, Designated Counsel, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Stephen W. Kirsch, on the brief).

Ian Kennedy, Assistant Prosecutor, argued the cause for respondent (Mark Musella, Bergen County Prosecutor, attorney; Ian C. Kennedy, of counsel and on the brief).

PER CURIAM

Shortly before midnight on March 6, 2011, someone entered Robert Cantor's home in Teaneck, shot him in the back of the head with a .380 caliber handgun, placed his body in his bed, doused it with an accelerant and burned him beyond recognition. Defendant Sui Kam Tung became a suspect in part due to his alarming months-long campaign of stalking Cantor and Cantor's girlfriend, who was defendant's estranged wife. He also provided a false alibi to police, deleted over one million files from his computer on the night of the murder, lied to detectives about his history of gun ownership, and four months prior to the murder, asked a friend about purchasing a magazine of the same caliber ammunition used to kill Cantor.

Defendant was indicted and convicted by a jury of first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2); second-degree aggravated arson, N.J.S.A. 2C:17-1(a)(2); second-degree possession of a weapon with unlawful purpose, N.J.S.A. 2C:39-4(a); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); second-degree desecration of human remains, N.J.S.A. 2C:22-1(a)(2); third-degree hindering by way of concealment or destruction of evidence, N.J.S.A. 2C:29-3(b)(1); fourth-degree tampering by destroying computer data, N.J.S.A. 2C:28-6(1); and fourth-degree stalking, N.J.S.A. 2C:12-10(b). The jury found him not guilty of second-degree burglary, N.J.S.A. 2C:18-

A-1158-23

2; first-degree felony murder during a burglary, N.J.S.A. 2C:11-3(a)(3); and first-degree felony murder during an act of arson, N.J.S.A. 2C:11-3(a)(3).

In a published opinion, we reversed defendant's convictions and life sentence. We did so after concluding the court's cumulative errors "in allowing (1) evidence of his invocation of the right to counsel, (2) references to his refusal to consent to a search of his computer and car, and (3) testimony by the interrogating officer, who the jury knew administered lie detector tests for ten years," and who stated he "knew defendant was lying," combined to deny defendant a fair trial as they undermined the "integrity of the verdict." See State v. Tung (Tung I), 460 N.J. Super. 75 (App. Div. 2019).

The State retried defendant and he was again convicted on amended charges of murder, arson, possession of a weapon for an unlawful purpose, unlawful possession of a handgun, desecration of human remains, hindering apprehension, tampering with physical evidence, and stalking. The court sentenced defendant to a custodial term of life with eighty-five percent parole ineligibility.[1]

---

[1] On remand, the trial court amended the counts of the original indictment based on the acquittal on certain charges in the first trial.

Before us, defendant asks us to consider:

 I. DID THE COURT ERR BY DENYING DEFENDANT'S MOTION TO ACQUIT.

 II. DID THE COURT ERR BY ALLOWING LAY OPINION [TESTIMONY] FROM THE STATE'S WITNESSES TO BE PRESENTED TO THE JURY.

 III. DID THE COURT ERR BY ALLOWING HEARSAY TESTIMONY REGARDING THE VICTIM'S ALLEGED FEAR OF DEFENDANT.

For the following reasons, we answer all of defendant's questions in the negative, reject all of his arguments challenging his convictions, and accordingly affirm the jury's verdict.

I.

For convenience to the reader, we restate the relevant facts underlying the parties' dispute as set forth in our prior opinion, supplemented by those additional facts from the record and the subsequent procedural history. Tung I, N.J. Super. at 81-92. We recite the facts in greater granularity than we typically would because we consider it necessary for an informed understanding of the issues raised.

As noted, Cantor was shot in the back of the head while in his home in Teaneck. His body was found in his bed in the basement bedroom, doused with

A-1158-23

an accelerant, and set on fire. Defendant, the estranged husband of Cantor's girlfriend, S.,[2] was the only suspect considered by the police. Teaneck police, with assistance from the New York City Police Department, investigated the incident.

S. met defendant when they were working at the same translation agency. They began a relationship, and in the summer of 1999, she moved into defendant's apartment in New York City. In February 2000, S. became pregnant with their first daughter, and defendant lost his job. S. testified that defendant lawfully had a gun at this time. However, she said he told her that he had relinquished the gun to a police precinct because she was concerned with having a gun in the apartment with her first child.

S. and defendant married, and by 2005 the couple had two more daughters, and defendant was still unemployed. In 2008, defendant and a friend opened a computer repair store in Manhattan with S. paying the $1,800 monthly rent. The store operated at a loss for the next two years, and the family relied on S.'s full-time employment and savings.

---

[2] Consistent with our previous opinion, we use an initial to preserve the confidentiality of defendant's wife.

A-1158-23

S. testified that by the summer of 2009, she felt "burnt out" from having to financially support the store and family. In September of that year, she attended a lecture and met Cantor, and over the next month, she and Cantor started a relationship. S. created a separate email account to communicate with Cantor and began going out with him socially. Eventually, S. admitted to defendant that if they had not had children together, she would not be with him. In December 2009, she told defendant she was thinking of moving out.

Ted Finkelstein testified that Cantor was his best friend and that they had known each other for nearly forty years. He remembered that in 2009, Cantor's marriage "had been on the rocks a little," but that he had never shown any interest in other women during his marriage until he met S.

Cantor married S.K., his wife, in 1982, moved to Teaneck in 1985, and they had two daughters. Cantor's wife testified that in 2008, she and Cantor were going to therapy and thinking of separating, and although she moved out in September 2010, the marriage was not formally ended. Prior to S.K.'s moving out, Cantor began sleeping in the basement bedroom.

S. recalled the first time she and Cantor were intimate was on February 13, 2010, in his basement bedroom. The following day, she received a Valentine's Day card from defendant in which he wrote things she had told

6

Cantor by email. On February 15th, Cantor told S. he had received anonymous emails that concerned him. Cantor also told Finkelstein about the emails and "initially he didn't know who they were from, but they were of the nature that someone was watching him, somebody was watching him and [S.], knew what they were doing and they had an ominous tone to it." He recalled that Cantor "was freaked out. He didn't know what was going on." Finkelstein later learned that defendant had visited Cantor at his home three times, to which he testified Cantor was "very upset and somewhat frightened and somewhat intimidated."

On February 16th, S. noticed that two emails from Cantor in her Gmail account had been forwarded to defendant's email address, and she concluded that defendant must have hacked her account. When defendant was out later that day, S. checked his email account, and although she did not find the forwarded emails, she saw two other emails to his friend Sandra. In one email, dated February 13, 2010, defendant told Sandra that he knew S. was involved with someone else, and while defendant believed they hadn't yet slept together, "this guy just wanted to go in her pants." In another email, dated February 15, 2010, defendant told Sandra that S. and Cantor had been intimate.

When S. checked her laptop again, she found a "little text file" she had never seen and found it was a log-in file from Shark Spyware, registered to Lord

7

168 Khan. S. explained that defendant had used the username Lord Tung for accounts, that 168 is a lucky number in Chinese culture, and that Genghis Khan was a "kind of idol" to defendant.

When she confronted defendant later that night, he claimed he knew about her relationship with Cantor because he received an anonymous FedEx package with copies of her emails, but he did not check for a return address on the package before he threw it away. Defendant claimed "Eor Alld," a person he did not know, was stalking Cantor, found that Cantor had ties to the Israeli mafia, and was updating him daily about Cantor.

Defendant then forbade S. from calling Cantor, and suggested S. return to France. The following day, S. called Cantor and advised that defendant knew about their relationship. When S. confronted defendant about the spyware, he said he did not know who "Lord 168 Khan" was and instead suggested that someone had hacked them and installed the software on both their computers.

S. testified that on February 18, 2010, defendant advised her he was going to withdraw $2,000 from their bank accounts to purchase a gun to defend the family. That evening, defendant returned with a brown paper bag with a gun in it and placed it on a kitchen shelf. S. objected to the gun being in the house and

A-1158-23

insisted that defendant return it; after a day or two, she testified, the gun was gone. She testified that defendant told her that "he took care of it."

S. moved out on March 6, 2010. Sometime in April, S. testified that she and defendant began seeing a couples therapist once or twice a week, and defendant expressed he did not want their marriage to end. While they were separated, S. continued paying defendant $1,500 each month because she "felt bad and I knew he needed the money . . . and he was still the dad of [their] girls." Towards the end of the summer and into the fall, S. had a mediator draft a separation agreement and, when defendant refused to sign, she stopped making the payments. Defendant called her and demanded she wire the money to him, but she refused.

In a November 9, 2010 email to his friend Ki Lee, defendant asked him to purchase on his behalf a "Walther .380 caliber magazine." While the email is not in the record before us, Lee testified at trial that after speaking briefly with defendant over the phone, defendant emailed him a link to the magazine and "asked [him] to purchase it."

S.K. recalled an "unusual" incident in the summer of 2010, when she was leaving their house for work and saw a "kind of tall, Asian man" wearing a long overcoat lingering around the house but did not tell anybody about it. She also

9

received a message from an unknown person on Facebook in the fall of 2010, informed Cantor via email that she had received this message from someone named "Eor Alld," and read it into the record at trial:

Hi [S.K.], I'm not sure if you know that your husband . . . , Rob, has been cheating on you with a younger woman for the past year. I just can't stand it anymore. I feel that you should know. Please don't blame yourself for the marriage. Let me know if you want more information slash, a friend

In January 2011, S. contacted a lawyer to file for divorce, and she testified that defendant was served with the divorce papers around March 3, 2011.

Defendant spent Sunday, March 6, 2011, the day of the murder, with his youngest daughter. At about 8:00 p.m., defendant took her back to S.'s apartment and spent about twenty minutes with all three of his daughters. The middle child told defendant she met "a guy named Robbie" who was "mommy's friend" when she went to the museum with S. that day. Cantor had never before met any of defendant's children. Defendant told the police he was not angry because "[i]t was bound to happen."

Scott Robinson had been Cantor's neighbor since Cantor moved into the Teaneck home. He remembered Cantor and his wife as "great neighbors" who were "very peaceful soft spoken gentle people" although he was "never super close" with Cantor, and he "never imagined" Cantor would have enemies.

10

A-1158-23

Robinson remembered the night of March 6, 2011, was rainy and chilly, and testified that after his wife had gone to bed, he heard "a bang or a . . . thud" around 11:45 p.m. coming from the direction of Cantor's house. He at first believed something had struck his house and dismissed the noise, but approximately thirty minutes later, he heard somebody yelling about a fire and banging on his door.

Gregory Wright was a police officer on patrol nearby on March 6th and responded to a call regarding the fire at the home. When he arrived, he noticed smoke coming from the house and, after speaking with Robinson, went to the front door to see if it was unlocked. Finding the door locked and receiving no answer to his ringing the doorbell, he went around to see if there were any other entries to the home, but he found that the rear door was also locked.

James Costello, then a sergeant with the Bergen County Prosecutor's Office (BCPO), testified that he was called at approximately 7:00 a.m. on March 7th, to "oversee" a post-mortem investigation and "collect any evidence that the doctors retrieve from the body." At first, law enforcement investigated the incident as a "fatal fire" rather than a criminal investigation. However, once the recovered body was x-rayed, officers discovered "a projectile" in the skull.

A-1158-23

Bullet fragments were removed from the back of the victim's head and burnt feathers from the comforter were removed from the body.

On the morning of March 7, 2011, officers obtained a search warrant and conducted a search of Cantor's house, finding his wallet, containing approximately $575, on the second floor. The police also found a .380 caliber shell casing in the basement where Cantor's body had been found, under the bed using a metal detector. No fingerprints were recovered from the shell casing, and Costello explained at trial that the casing was not tested for DNA evidence "due to the fire that it was engulfed in, all DNA material would be destroyed." Officers also collected a black sweatsuit, parts of the bed's comforter, and two sections of carpet to test for hydrocarbons or other flammable liquids at the New Jersey State Police Lab.

Costello also collected an HP Computer, a Linux camera, a Panasonic tape recorder, a Dell Vostro 220 computer system, two flash drives, and a cell phone. Detective Cecelia Love of the BCPO Homicide Squad analyzed Cantor's computers and flash drives and in response to the State's question at trial about her review, found no evidence leading to other potential suspects or connections to organized crime or the Israeli mafia.

A-1158-23

The medical examiner, Dr. Jennifer Swartz, testified that she performed the autopsy on March 7, 2011, and the x-ray showed "radiopaque" material typical of a bullet wound and "extensive fracturing and absence of the top of the skull." The bullet entered on the right side of the head, near the base of the skull, and was recovered in the left frontal part of the brain. She was able to conclude that the gun was not "pressed up against the scalp and the head tightly," but she could not say "whether it was an inch or two away versus a couple of feet away." She ruled the cause of death to be "a gunshot wound of the head and the manner was homicide."

Swartz also described the body as "severely burned" and noted "there were fractures of the facial bones of the wrists and of the right thigh." She determined based on the location of the burn wounds and the condition of the body, that it was "more likely than not that he was on his back rather than laying on his front when the fire started."

Defendant was questioned by Detectives James Brazofsky and Mark Fisco on March 7, 2011, in New York City and that questioning is the primary issue of one of defendant's appellate arguments. Detective Brazofsky explained to

13

defendant that he was not under arrest and was free to leave at any time and read defendant his Miranda[3] rights.

Defendant explained he was born in China, but he came to the United States in 1974 and became a citizen sometime later. He told detectives about his troubled relationship, the custody arrangement with the children, and S.'s desire for a divorce. After detectives asked defendant whether he "ke[pt] any kind of items for protection," defendant admitted he had at one point owned a 9 mm Beretta handgun and claimed he owned it legally and surrendered it when the kids were born. He said he had kept the magazine, and it was still in his apartment. After detectives presented defendant with S.'s statement that she was aware that he had more recently acquired a gun, he explained that he obtained another gun from "a friend" and described it as a small, compact 9 mm Beretta, but he said he gave it back to his friend after a day or two.

When asked by detectives if S. was seeing anyone, he said they "don't communicate about that kind of things" but he "assum[ed] she is." He then admitted he knew she was seeing a man called Rob or Robbie. Defendant told detectives he had found out about the affair in an email, when he "was kind of suspicious" and installed a program on her laptop to track her keystrokes. He

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

A-1158-23

printed out the emails he found between S. and Cantor and recalled that when he was organizing them, he was shaking because he was angry.

He also admitted to detectives that he went to Cantor's house, waited for Cantor's wife to leave, explained he was S.'s husband, and spoke with Cantor for about three hours. He said he asked Cantor "to do the right thing to redeem" himself. Defendant said they also spoke about the Buddhist belief that all suffering comes from desire, with defendant telling Cantor that he and S. were "going towards desire and lust."

He stated when he went to Cantor's house, they went down to the basement because he "wanted to know where they actually have relationship, relation." Defendant also said he visited Cantor about a month later to "sort of gauge what his, his situation is." He denied, however, that either conversation was confrontational.

Defendant told detectives that on March 6, 2011, when he dropped one of his daughters off at S.'s apartment, he learned from his daughter that she had gone to the museum with S., and that she had met Cantor and some of his friends. He stated he then left S.'s apartment around 8:30 p.m. and went home to drink between two and four beers, read emails, and watch the news. He told detectives

15

that he did dishes for two and a half hours and then, sometime around 1:00 a.m., left his apartment to purchase more beer.

Detective Brazofsky told defendant during the interrogation "I don't believe you were home all night last night," that there was "a problem over in Teaneck," and that his name had come up in the investigation. Defendant asked if something had happened to Cantor and asked "He's okay? Cuz he should see who assaulted him, right?" After defendant insisted he stayed home all night except for the 1:00 a.m. trip to buy more beer, Detective Brazofsky told defendant:

> I believe that you went over there last night. I don't believe you stayed home. Okay. I believe you went over there to confront him about him going out with your daughter and [S.], you know, I don't care if his two friends are there or not cause if we spoke—there's detectives speaking to them too.

Detective Fisco also told defendant that he believed defendant had not told them the truth and said that "the time of the lying and the bullshit, it's . . . over. You need to talk to us, you need to explain to us what happened." On cross-examination, Detective Brazofksy testified that he had told defendant he was in New Jersey because he "believed he was not being truthful with me." The court expressed concern with the potential testimony, advising counsel:

A-1158-23

I am [going to] instruct the jury to disregard his opinion as to whether he believed Mr. Tung was being truthful or not. That is their function. It is not his function. All right?

Because we are delving into an area now that we are potentially going to elicit more testimony from him that involves an opinion. And I do not want to have a situation where . . . he is answering the questions. He is being responsive. But . . . if we are going to get into a situation like we did with the first trial and he is going to be inserting his opinions as to his subjective belief as to whether somebody is being truthful or not—he can talk about inconsistencies. But . . . as far as giving his opinion that he was not being truthful, that's the jury's function.

Immediately after discussing its concerns with counsel, the court advised the jury that it was "instructing you to disregard this witness's opinion as to whether or not [defendant] was being truthful or not. That is your function. You will determine whether . . . the statement or any portion of it is credible." The court further advised the jury that "you are the sole judges of the facts here. You are the sole determiners of the credibility of every witness that testifies." To this end, throughout the trial, the court issued explicit limiting instructions to the jury regarding credibility determinations on at least six occasions and gave several implicit instructions that the jury was to determine the credibility of statements and what weight to afford them.

17

A-1158-23

The parties also reminded the jurors of their exclusive function. Defense counsel emphasized the primacy of the jury in providing a check and balance to a prosecutorial judgment in both his opening statement and summation. The State likewise reminded jurors during summation that the only relevant opinion as to defendant's guilt was that of the jury.

When Detective Brazofsky testified that he stopped interrogating defendant when defendant indicated he did not wish to speak anymore, the court instructed the jury that it was to disregard the answer. After dismissing the jury for a short break, the court admonished Detective Brazofsky and told him if he referenced defendant asserting his right to remain silent, he was "going to instruct the jury to disregard what you said . . . and strike [his] entire testimony . . . ." When the jury returned, the court again instructed that "testimony regarding how the interrogation may have ended or not, that is stricken. Okay? That is stricken from the record. It's not to be considered by you. You're not to draw any negative inferences from that toward the defendant whatsoever."

Sergeant Terrence Lawler testified as an expert in the origin and causes of fire and explained that he was a member of the BCPO Arson Task Force. He examined Cantor's home and concluded that the electrical breakers, outlets, electric switches, water heater, and boiler were not the cause of the fire. He also

concluded that Cantor's body was on the bed on his back with his head closer to the foot of the bed and "that the fire started on top of that bed, specifically . . . where Mr. Cantor was located."

Sergeant Lawler also explained that after examining the floor, investigators were able to determine a "pour pattern." However, it was not until the carpet was tested that he determined that ethanol had been poured on the comforter. Anthony Mazzarella, a forensic scientist and assistant laboratory director with the State Police Office of Forensic Scientists, testified as an expert in the field of fire debris and analysis. He confirmed the presence of ethanol on the comforter and explained that for ethanol to survive the fire to be tested, it must be used in "mass quantities," pooled in an indentation, be protected by something, or a combination of all three.

Detective Kristen Paxos with the Cyber Crimes Unit was assigned to identify users of certain email accounts and analyze certain data received from third-party technology companies. She found that an IP address associated with defendant's computer repair store was connected to a username, "SKTung." She also found several email addresses associated with defendant, created using IP addresses associated with either defendant's home or store including EJor325@gmail.com, Eor247@gmail.com, Eoralld@gmail.com,

A-1158-23

sktt@live.com, sktt@yahoo.com, and ICISystems@hotmail.com. Paxos noted that the IP log, which shows the location of the IP addresses, indicated that on February 7, 2011, at 4:31 a.m., the address was in New York City, but at 4:33 a.m., it was located in Sweden. From February 7 to February 21, 2011, the IP address bounced between England, Russia, Wisconsin, Virginia, New York, and Germany.

Paxos read through the emails of these accounts and Cantor's email address, Allshine@gmail.com, and she estimated there were "upwards of 20,000 in total." She explained her role in the investigation:

> A:    I'm looking for, uh, anything and everything. I'm looking for . . . information about . . . who [Cantor] had been in contact with, if he had any grievances with anybody, if there was any evidence of . . . problems in his life. If there was . . . communication between him and somebody, or maybe just some went to him that would indicate that . . . there was a problem, anything like that.
>
> Q:    Now, if you found one of those emails, what would you do with it?
>
> A:    I would have brought it to the attention of the Case Detective.
>
> Q:    And in terms of full review of the [G]mail account Allshineon@gmail.com, um, did you identify and flag any emails that you saw as concerning or threatening to Rob?

20

A: I did. I . . . identified the emails, um, the Eor emails, all of them in their entirety.

. . . .

Q: So, the question I just posed to you, in addition to the Eoralld@gmail.com emails, did you identify and flag any other emails from any other accounts, . . . that you saw as threatening or concerning towards Rob?

A: I did not.

Several emails were sent by Eoralld@gmail.com to Cantor, saying that the writer had seen Cantor with S. and at first assuring him that "your secrets are safe with me," but later saying, "Man, this is so uncool. I didn't know she is married and has three little kids" and, "I think you should stop. You already have your fun." Paxos also testified that defendant seemed to be emailing himself from Eoralld@gmail.com to Sktt@yahoo.com, which she found to be of interest.

Paxos testified again at trial as an expert in digital forensics. She found an application called CCleaner had been run on the computer from 2:45 a.m. to 7:51 a.m. on March 7, 2011, to permanently delete one million items of data. Defendant had only ever used this program three other times.

Michael Guzman, a detective with BCPO's Major Crimes Unit in 2011, executed a search warrant for defendant's residence. He found defendant's

21

A-1158-23

apartment to be "completely filthy" with a dirty pot in the small sink. He testified that during the search, he found a gun box containing tools for cleaning a 9 mm gun, 9 mm bullets, and gun magazines with 9 mm hollow point ammunition.

Detectives also traveled to Texas to question Lee about the November 2010 email concerning the Walther Pistols webpage for a .380 caliber magazine, which as noted is the same caliber ammunition of the bullet that was used to murder Cantor. Lee testified at trial that defendant had asked him to "do him a favor" and order the magazine for him because "it would be a lot easier to order it from the state of Texas than New York." Lee said he refused because he "wasn't comfortable with it at all" after reading New York's gun laws. Reviews of defendant's computer showed bookmarked websites grouped under the heading of "Guns" for gun manufacturers and the Walther Pistols gun store.

Heather Norman testified as an expert in call detail and cell site analysis. She testified that, in analyzing defendant's cell phone data, she found that the only time his phone connected to a tower in New Jersey was on May 21, 2010. However, she explained that if a phone does not receive an incoming call or place an outgoing call, it would not ping off any towers. The last call the phone made on March 6, 2011, was to S.'s landline number at 7:57 p.m.; there were no

22

A-1158-23

calls or phone activity for the next twenty-four hours. On March 8, 2011, a MetroPCS prepaid phone was opened under the name of Sam Lee, and Norman believed defendant was using this phone based on a history of defendant's calls to his brother and the prepaid phone's calls.

Police also obtained surveillance videos from a café, a high school, and a convenience store near defendant's apartment. Using New York City's license plate readers, defendant's car was located near the high school on the corner of 1st Avenue and East 76th Street, where it had been parked from 10:10 p.m. on March 6, 2011, through 1:31 a.m. Although the convenience store where defendant said he bought beer could not provide video evidence, investigators "did receive information that . . . [defendant] had been at the deli . . . between 1[:00] and 2[:00] a.m. on March 7th." The café surveillance video showed defendant walking down York Avenue around 10:10 p.m. on March 6, 2011, and video from near the high school showed him walking towards his car about twenty minutes later. A search of defendant's computer also showed he was not surfing the web or reading emails as he claimed.

At trial, defense counsel presented a theory that defendant was arrested because BCPO "was under tremendous pressure from the community" and from Cantor's friends and family. Counsel argued in his opening statement that

23

if the prosecutor had ample evidence to support their theory at the time, they would have arrested [defendant] from March 7, 2011, maybe April of 2011 . . . but they didn't. Do you want to know why? Because they did not have evidence. But it was after they got the pressure from the community—that's when the prosecutor acted.

Defendant's counsel also elicited testimony from Finkelstein that, while the investigation was ongoing, he formed an organization of approximately twenty people who were following the case closely and wanted Cantor's "murder[er] brought to justice as quickly as possible." The group hired a private investigator and held a demonstration outside the courthouse on February 1, 2012. Although S. was aware of this group, she did not participate in the demonstration because she "had the confidence that the . . . prosecutors were doing what they needed to do. That their interests in solving this case [were] the same as mine and all of ours."

The defense also introduced an article from The Bergen Record titled "Another Aided in Teaneck Slaying." In this article, the County Prosecutor at the time, John Molinelli, responded to questions of whether there was a possibility that someone other than defendant had shot Cantor, saying "Yes. We have not ruled that out."

24

Molinelli was called as a rebuttal witness and explained that, during his time as prosecutor, "I would always use the standard reply and that is, we have not ruled out anything. It's a very vanilla response that simply says, we never rule out anything. That's all it means." Molinelli testified he was not aware of "any other evidence, statements or otherwise . . . that ever pointed to any other suspects or accomplices."

As noted, defendant's counsel stressed throughout trial that the police and prosecutor did not thoroughly investigate Cantor's murder and concluded that Finkelstein's group put pressure on BCPO to arrest someone. Defendant reiterated the point in summation, arguing that BCPO had doubts as to defendant's guilt but "allowed the pressure of—from the community that caused [them] to act" and arrest defendant.

Prior to the retrial, the parties agreed to certain redactions from defendant's statements to police, and in that regard, defendant filed a motion to redact portions of his statement to address the remaining statements for which the parties could not agree. Defendant's counsel argued, and the court agreed, that there was a "distinction" between officers saying, "I don't believe you" during interrogation and stating what their answer would be in response to those same questions "when you're being truthful." The court found that "where it

25

crosses a line is where [Detective] Brazofsky injects his opinion as to what [Detective] Brazofsky's answer would be in response to that question" and redacted that portion of the interrogation. The court also noted that "[t]he Appellate Division didn't hold that the specific comments during the interrogation were improper. It . . . was really the comments, the commentary during the playback" of the interrogation for the jury, and the court agreed with the State that the issue could be properly addressed with an appropriate instruction to the jury.

During the course of defendant's seventeen-day retrial, the audio of the redacted statement was played for the jury during the trial and again at the jury's request during deliberations. The jury, while deliberating, asked to listen to the interview tape again, and the court accordingly provided it to them. The court again instructed the jury that "[i]t's your function to determine whether or not the statement was actually made by the defendant. And if made, whether the statement or any portion of it is credible."

At the close of the State's case, defendant moved for a judgment of acquittal. The court denied the motion and explained that there was "ample direct and circumstantial evidence" and that "even if there were no direct evidence," a reasonable jury could find defendant guilty of the charges beyond

26

A-1158-23

a reasonable doubt based solely on inferences drawn from the circumstantial evidence. Prior to sentencing, defendant again moved for a judgment of acquittal pursuant to Rule 3:18-2, but the court again denied the motion, finding again that there was a significant amount of circumstantial and direct evidence to support the convictions.

## II.

In his first point, defendant argues that the court committed error when it denied his motion to acquit. He argues that at best, the State only presented circumstantial evidence that defendant had motive, means, and opportunity to commit the murder rather than proof defendant was guilty beyond a reasonable doubt. Defendant maintains the court erred in relying on this circumstantial evidence in denying the motion, even though the evidence fell far short of the legal standard, and as such, defendant was denied due process, requiring reversal. In support of the argument, defendant relies primarily on State v. Lodzinski, 249 N.J. 116 (2021), and stressed that, here, the State failed to discover any forensic proofs tying defendant to the crime or to the State of New Jersey on the night of the murder, nor did defendant make any substantive admissions.

We disagree.  The court correctly determined there was "significant evidence in this case," and specifically that there "was direct evidence that there was the murder of . . . Cantor. . . .  There [is] also an incredible amount of circumstantial evidence pointing to [defendant] as being the perpetrator."  The court also found that there was ample evidence to show the elements of the other charges.

An appellate court reviews a motion for acquittal under Rule 3:18-1 de novo.  State v. Jones, 242 N.J. 156, 168 (2020) (citing State v. Williams, 218 N.J. 576, 593-94 (2014)).  A court must consider "the State's evidence in its entirety, be that evidence direct or circumstantial."  Ibid. (quoting State v. Reyes, 50 N.J. 454, 458-59 (1967)).  Further, the court must "consider the State's proofs from the proper standpoint and determine therefrom how the motion should have been decided.  In so doing, under the current state of our law, no consideration may be given to any evidence or inferences from the defendant's case."  Reyes, 50 N.J. at 459 (citing State v. Fiorello, 36 N.J. 80, 86-87 (1961)).  The court must view the State's evidence in the light most favorable to it, but this does not "lessen 'the State's burden of establishing the essential elements of the offense [or offenses] charged beyond a reasonable doubt.'"  State v. Perez,

177 N.J. 540, 549-50 (2003) (alteration in original) (quoting State v. Martinez, 97 N.J. 567, 572 (1984)).

Rule 3:18-1 provides, in pertinent part:

> At the close of the State's case . . . , the court shall, on defendant's motion or its own initiative, order the entry of a judgment of acquittal of one or more offenses charged in the indictment or accusation if the evidence is insufficient to warrant a conviction.

The lack of direct evidence is not fatal to the State's case, as circumstantial evidence "often can be as persuasive and powerful as direct evidence and sufficient to support a conviction." Lodzinski, 249 N.J. at 146-47 (citing State v. Goodman, 9 N.J. 569, 581 (1952)). "The probative value of circumstantial evidence is determined by the rules of ordinary reasoning such as govern mankind in the ordinary affairs of life. Circumstantial evidence can support a verdict against a defendant if it is sufficient to generate a belief of guilt beyond a reasonable doubt." State v. Papitsas, 80 N.J. Super. 420, 424 (App. Div. 1963) (citing State v. Bulna, 46 N.J. Super. 313, 318 (App. Div. 1957), aff'd 27 N.J. 93 (1958)).

Juries may properly consider and "draw logical inferences from the evidence presented to them and that circumstantial evidence is of as equal weight as direct evidence." State v. Cagno, 211 N.J. 488, 512 (2012). However,

"[a] jury may not fill a missing element of an offense by resorting to 'conjecture' or 'pure speculation.'" Lodzinski, 249 N.J. at 158 (quoting Curley v. United States, 160 F.2d 229, 232 (D.C. Cir. 1947)). Thus, a motion for acquittal must be denied "[i]f the trial judge is of the belief that a jury could reasonably find that the State had established defendant's guilt beyond a reasonable doubt." Papitsas, 80 N.J. Super. at 424.

We are convinced the State presented ample evidence to support defendant's conviction, notably the overwhelming circumstantial evidence sufficient to connect defendant to the alleged crimes in a number of ways, including the evidence that established defendant's motive. Specifically, the State introduced extensive evidence of defendant's disdain toward Cantor and S.'s relationship, including installing spyware on S.'s computer, monitoring her emails, creating outlandish theories about Cantor's alleged nefarious connections, and visiting his home on several occasions, including an instance in which defendant insisted on seeing the bedroom where Cantor was eventually murdered. The State also presented evidence regarding the events immediately preceding the alleged offenses, which it contends prompted the defendant to commit the crimes charged, including the fact that S. served defendant the

divorce complaint three days prior, her decision to terminate her voluntary support payments, and defendant learning that Cantor met his children.

The State also introduced circumstantial evidence of means and opportunity, including surveillance footage showing defendant leaving his apartment one hour before Cantor's murder; photographic evidence and a forensic examination of defendant's computer that disproved his alibi that he was merely cleaning his apartment and searching the internet at the time of the murder and not in New Jersey; and defendant's recent request for his friend to purchase a magazine on his behalf of the same caliber ammunition that was used to murder Cantor.

The State also presented evidence of defendant's consciousness of guilt.[4] Those proofs included the highly incriminating fact that defendant wiped his computer on the night of Cantor's murder before he was even a suspect and later provided a false alibi and misrepresented his gun ownership history with respect to the Beretta he purchased in February 2010 to the police. While the evidence connecting defendant to the crimes was indeed largely circumstantial, we are

---

[4] On this point, we note defense counsel at oral argument before us stated the State failed to present sufficient evidence other than defendant's "guilty conscience which [were] misstatements to the police regarding [his] presence at a particular time . . . [and] evidence that he wiped a computer drive or attempted to wipe a computer drive at least partially clean . . . ."

A-1158-23

satisfied the court did not err in finding that a jury could reasonably conclude that defendant committed the offenses to which he was charged and convicted.

We further find defendant's reliance on Lodzinski unpersuasive. In that case, our Supreme Court reversed and vacated the defendant's murder conviction, finding that "no reasonable jury could find beyond a reasonable doubt" that the defendant could have purposefully or knowingly caused her son's death. 249 N.J. at 121 (citing Williams, 218 N.J. at 594). The State introduced circumstantial evidence at trial of a blanket connected to the defendant's home and found near the child's remains, but there was no direct evidence of the defendant's guilt otherwise, and the medical examiner could not determine a cause of death. Id. at 119-20. Further, during the trial, the State presented several different theories accounting for the child's disappearance and cause of death, including several contradictory statements by defendant. Id. at 156.

The Court found that the State had "offered no direct or inferential evidence that Lodzinski purposely or knowingly caused [her son]'s death—an essential element of the crime of murder," which was particularly problematic in light of the fact that the jury would be expected to "rationally choose between reckless manslaughter or purposeful or knowing murder." Id. at 157 (citing State v. Brown, 80 N.J. 587, 592 (1979)). The Court also determined the State's

32

proffered motive was "based on questionable tropes and stereotypes about single working mothers" and determined the contradictory evidence did not support the conclusion that she possessed any consciousness of guilt. Id. at 153-54. Accordingly, the Court concluded that a reasonable jury could not find "that defendant purposefully or knowingly caused her son's death." Id. at 116.

In light of the evidence presented during defendant's seventeen-day retrial, the differences between the facts presented in Lodzinski and here could not be clearer. First, unlike the proofs presented by the State in Lodzinski that failed to answer the "how," "when," and "where," concerning the victim's death, the evidence introduced by the State indisputably establishes with great precision that Cantor was, indeed, the victim of a purposeful or knowing murder in his home in Teaneck shortly before midnight on March 6, 2011.

Second, unlike in Lodzinski where the alleged motive relied upon "questionable tropes and stereotypes," the State presented overwhelming evidence with respect to defendant's resentment of S.'s relationship with Cantor, for which defendant took extensive steps to obsessively monitor and attempt to undermine. Further, we conclude the State's overwhelming evidence of defendant's consciousness of guilt could in no way be interpreted to be contradictory, unlike the proofs in Lodzinski. In sum, we conclude the court

33

properly denied defendant's motion for acquittal based on the circumstantial evidence presented that included defendant's motive, means and opportunity, and consciousness of guilt.

III.

In his second point, defendant maintains the court committed error when it admitted improper lay opinion testimony from detectives regarding defendant's guilt and credibility that we deemed inadmissible in defendant's first trial, and which led to our earlier decision reversing defendant's convictions. Defendant challenges a series of statements made by Detectives Brazofsky and Fisco during his interrogation. Specifically, he contends the court did not properly redact the detectives' repeated assertions regarding defendant's whereabouts on the night of the murder, including their belief that defendant was in New Jersey, which defendant contends the State's case was otherwise "completely lacking in proof."

Among the statements cited by the defendant are the following: Detective Brazofsky stated, "Okay? I knew you went over there, okay? . . . Hey, listen, two minutes, all right? I knew you went over there last night." He later remarked, "I believe you went over there last night, okay?" Detective Fisco explained, "We know where you were last night. We just wanted you to explain

A-1158-23

to us what happened.  We need you to tell us what happened.  We need - again, you're the one who gets to explain to us what happened."  The detectives continued to press the defendant, with statements such as:

> No, I understand.  No, I'm telling you I agree with you, okay?  But I believe that you went over there last night.  I don't believe you stayed home, okay?  I believe you went over there to confront him about him going out with your daughter and [S.]  I mean, I don't care if his friends were there or not, I mean, we saw - the detectives, okay?  I believe you went over there, you were angry, and whatever he said to you got you upset and something just happened, okay?  But I - I got - listen to me, I've got to hear that from you, okay?  Because there's - there's two scenarios here, okay?  There's really one of two scenarios here.  Either you just don't care about your kids, or yourself, or anybody else, and you went over there last night (indiscernible), okay?  Or you went over there last night to try and straighten something out and say, you know what, until I'm divorced you stay away from my kids, you're going to hurt my kids, and you're there trying to protect them, and he opens up his mouth to tell you to leave, or tell you don't tell me what to do, I'll do whatever the F I want, okay, and he pushed you and pushed you, and you snapped, okay?

Throughout the exchange, the detectives reiterated their belief, stating, "I believe you went over there, absolutely"; "But I believe you went there"; and "Okay?  But I believe you were there . . . I believe you went over there, and I believe something happened between you two, whether he said something to you that pushed you over the edge."  They further asserted, "I believe you were over

there," and "Something happened with you two last night, when you went over there. Tell me, tell me what happened." Detective Brazofsky also stated,

> You went - you went there last night, okay? I know you did. I know you did, okay? The difference - the difference is it's going to come down to what you're telling me. Because the phone records are going to tell me you were there and what time you were there, okay? What it's time to tell me is why you went there, okay? If you went there to talk to him and make sure that he understood that you don't appreciate him seeing your daughter, and that's why you went there, then I need you to be honest, okay? . . . [I]f I didn't know that's why you went there then I wouldn't - I wouldn't even be asking you these questions, okay? There's no way, if I didn't care, I'll just collect evidence and then I'll - you could get charged, and I won't be here, okay? But after sitting down with you and talking to you for (indiscernible).

Additional objectionable statements according to defendant included, "I believe you went over there. . . . I believe you went over there"; "Tony, the bottom line is all this happened last night, okay, everything that happened is a direct result of this"; and "I'm telling you, there's going to be evidence that puts you over there in Jersey. That's going to be it," and, "I do claim one thing, okay? I believe you were over there, okay? I believe you were over there."

Defendant also argues that the jury was also presented with impermissible opinion testimony from Detectives Paxos and Love, and because we previously determined opinion testimony constituted error with the capacity to affect the

36

jury's verdict, we should do so again. Defendant cites State v. McLean, 205 N.J. 438, 463 (2011) to support the proposition that this improper opinion testimony bolstered the State's weak case and tipped the scales of credibility in its favor, necessitating reversal and acquittal. Defendant further relies upon State v. Watson, 254 N.J. 558 (2023), to argue that the detectives' testimony violated his confrontation rights in light of the State's failure to introduce the emails and computer data upon which they based their testimony.

A court reviews a decision to admit or prohibit a lay witness's testimony under an abuse of discretion standard. State v. Sanchez, 247 N.J. 450, 465 (2021) (citing State v. Singh, 245 N.J. 1, 12 (2021)). Thus, a trial court's ruling should not be disturbed "unless it 'was so wide of the mark that a manifest denial of justice resulted.'" Ibid. (quoting Singh, 245 N.J. at 13). However, where no objection was made at trial, the "error or admission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result."[5] R. 2:10-2.

---

[5] In light of defendant's failure to object to certain portions of the detectives' testimony, we note the varying standards of review necessary to assess defendant's arguments. With respect to Detectives Brazofsky and Fisco's statements in the interrogation, the record indicates defendant did not object to any of the statements as they appeared at trial and only sought redactions with respect two of the fourteen now-challenged statements.

Evidence is only admissible if it is relevant, that is, it has "a tendency to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. Witnesses may testify "only if evidence is introduced sufficient to support the finding that the witness has personal knowledge of the matter." N.J.R.E. 602. Although generally only an expert witness may offer an opinion, a lay witness may offer an opinion if it is based on his or her perception and will assist the jury in understanding the witness's testimony or in determining a fact at issue. N.J.R.E. 701. This rule ensures that "lay opinion is based on an adequate foundation." Neno v. Clinton, 167 N.J. 573, 585 (2001).

Lay opinion is impermissible when it is "an expression of a belief in defendant's guilt" or when it gives "an opinion on matters that were not beyond

---

We further note the record indicates defendant objected to Detective Paxos' testimony that she did not flag any other of Cantor's emails as "concerning or threatening" as "non-responsive," to which the court summarily overruled. Defendant also objected to Love's statement that her review of the computer data did not identify any other suspects, and after the parties agreed that Detective Love would not testify to any data she did not personally review at a sidebar conference, the court overruled defendant's objection.

In light of defendant's failure to properly preserve the majority of issues to which he now raises under this point, we review them under the plain error standard. Defendant himself concedes that the "legal merit of the point should be analyzed under the plain-error rule, R. 2:10-2." We note, however, our result would not differ had defendant properly preserved those objections, for the reasons stated, and conclude the court did not abuse its discretion in admitting the evidence.

the understanding of the jury." McLean, 205 N.J. at 463. "Additionally, witnesses may not 'intrude on the province of the jury by offering, in the guise of opinions, views on the meaning of facts that the jury is fully able to sort out' or 'express a view on the ultimate question of guilt or innocence.'" State v. C.W.H., 465 N.J. Super. 574, 593-94 (App. Div. 2021) (quoting McLean, 205 N.J. at 461). Indeed, we have previously recognized that:

> We go to extraordinary lengths in ordinary criminal cases to preserve the integrity and neutrality of jury deliberations, to avoid inadvertently encouraging a jury prematurely to think of a defendant as guilty, to assure the complete opportunity of the jury alone to determine guilt, to prevent the court or the State from expressing an opinion of defendant's guilt, and to require the jury to determine under proper charges no matter how obvious guilt may be. A failure to abide by and honor these strictures fatally weakens the role of the jury, depriving a defendant of the right to trial by jury.
>
> [Tung I, 460 N.J. Super. at 101 (quoting State v. Frisby, 174 N.J. 583, 594 (2002)).]

As we held in defendant's previous appeal, a witness should not "offer an opinion that a defendant's statement is a lie." Id. at 75 (citing Frisby, 174 N.J. at 594). This is especially true regarding police testimony, because a jury "may be inclined to accord special respect to such a witness" and "could have ascribed almost determinative significance to that opinion, which went to the heart of the case." Neno, 167 N.J. at 586-87. A police officer's testimony might also

impermissibly bolster or undermine the credibility of statements made by other witnesses.  Ibid.  While an interrogating officer's testimony about a defendant's appearance and behavior during an interrogation are admissible, "an '[officer's] opinions as to defendant's truthfulness and guilt . . . [are] not admissible as either demeanor evidence or lay opinion.'"  C.W.H., 465 N.J. Super. at 594 (alterations in original) (quoting Tung I, 460 N.J. Super. at 101).

We must also consider the well-stated principles that police are entitled to significant leeway with their interrogation techniques.  State v. L.H., 239 N.J. 22, 44 (2019) (citing State v. Galloway, 133 N.J. 631, 655 (1993); State v. Miller, 76 N.J. 392, 403 (1978)).  The court recognizes that a suspect "will have a 'natural reluctance' to furnish details implicating himself in a crime'" and so allows officers to use tactics "'to dissipate this reluctance and persuade the [suspect] to talk.'"  L.H., 239 N.J. at 43-44 (quoting Miller, 76 N.J. at 403).

In defendant's first trial, the comments on defendant's credibility were not limited to his interrogation.  Indeed, Detective Brazofsky testified at that trial that he had a decade of experience working in "the polygraph unit" and provided his interpretation of defendant's responses.  Tung I, 460 N.J. Super. at 86-87.  The prosecutor also referred to defendant's statements as "lies" during the trial and stated that defendant "hardly . . . sounds like someone who is innocent and

40

who has stated the truth, which we know he did not . . . ." Id. at 92. We concluded that "the jury's evaluation of whether his denial of guilt was credible was tainted by [Detective] Brazofsky's clearly and repeatedly stated opinion" and the prosecutor's statements. Id. at 103-04. The trial court also failed to instruct the jury to disregard Detective Brazofsky's testimony that he believed defendant was lying. Id. at 99.

As relevant to defendant's arguments with respect to the detective's statements during the interrogation, as we held in State v. Howard-French, 468 N.J. Super. 448, 464 (App. Div. 2021), "it is permissible for a jury to hear an officer accusing a suspect of guilt or doubting a defendant's alibi during an interrogation." Howard-French, 468 N.J. Super. at 464. In that case, our court concluded that a detective's interrogation tactic of accusing the defendant of lying was admissible because the statements "were not offered to persuade the jury that defendant was lying," because "[it was made] clear to the jury that it was obligated to determine the credibility of the witnesses and the statements admitted into evidence." Ibid. The court also believed that the record did not show that "the jury relied on the detectives' comments or that redaction of them would have changed the outcome of the trial." Id. at 465.

We addressed a similar question in State v. Cotto, 471 N.J. Super. 489, 533 (App. Div. 2022). In that case, an arson prosecution, the defendant, like defendant here, argued on appeal after failing to raise his concerns at the redaction hearing that the State's presentation of defendant's interrogation, in which detectives repeatedly asserted that defendant set the fire in question, was "the functional equivalent of impermissible lay opinion testimony" and "improperly presented the officers' opinion on the ultimate question of whether [he was] guilty." Ibid. We rejected the defendant's argument and concluded the detectives' remarks were "not presented to the jury as lay opinion testimony, but rather as statements . . . made to [the] defendant to induce him to admit that he was the person depicted in the surveillance video starting the fire." Id. at 538.

Accordingly, we found no error in the trial court's admission of the statements, particularly in light of "counsel's decision to seek redaction of some portions of the interrogation recording but not others [which] strongly suggests that . . . the unredacted portions were not prejudicial." Id. at 538. We noted, however, that "the better practice" was to "confirm on the record that defense counsel had no objection to playing portions of the interrogation" and also instruct the jury "that the detectives' statements made during the stationhouse interrogation should not be deemed testimony and may be considered only in

the context of understanding how the interrogation was conducted and how [the] defendant responded to the forceful accusations that were made against him during the course of the interrogation." Id. at 540-41.

With respect to the testimony of Detectives Paxos and Love, we further note "both the Confrontation Clause and the hearsay rule are violated when, at trial, a police officer conveys, directly or by inference, information from a non-testifying declarant to incriminate the defendant in the crime charged." State v. Branch, 182 N.J. 338, 350 (2005) (citing State v. Bankston, 63 N.J. 263, 268-69 (1973)). Our Supreme Court has repeatedly recognized that "a police officer may not imply to the jury that he possesses superior knowledge, outside the record, that incriminates the defendant." Watson, 254 N.J. at 610. Thus, the hearsay rule and Confrontation Clause may be violated if a police witness "repeat[s] what some other person told him concerning a crime by the accused" when explaining the reasons for taking a particular investigative action. Bankston, 63 N.J. at 268-69 (citations omitted).

Against these principles, we are convinced the court did not abuse its discretion nor commit error, plain or otherwise, when admitting the detectives' interrogation, including their repeated challenges to defendant's denials and assertions of innocence. We conclude the statements were properly admitted in

43

light of the context that they provided to the interrogation as they were played for the jury during trial and deliberations.

We reach this conclusion for several reasons. First, we are satisfied the statements only provided context and were not improper lay opinion testimony in light of the measures that the court took before and during trial. Not only did the court provide the parties an opportunity to identify which portions of the interrogation they did and did not object to being played at trial, but we are convinced that the remaining unredacted statements did not have any improper influence in light of the court's repeated credibility instructions to the jury, including instructions immediately after Detective Brazofsky testified to his statements in the interrogation. We discern the court's instruction that told jurors to "disregard this witness's opinion as to whether or not [defendant] was being truthful or not" was intended to ensure that the jury would not treat the detectives' statements as substantive evidence of guilt but instead would consider them for the limited purpose, in light of its consistent and repeated instructions to that effect. See Hrymoc v. Ethicon, Inc., 467 N.J. Super. 42, 79 (App. Div. 2021) ("We should not underestimate the intelligence and conscientiousness of jurors. . . . It is wrong to presume the jury would not have been able to understand and follow a limiting instruction from the judge.").

A-1158-23

Second, we determine the defense's own reliance on the statements to further its theory that law enforcement "rushed to judgment" supports that the nature of the statements was merely contextual.[6] The record demonstrates that when afforded the opportunity to seek redactions of the interrogation, defendant declined to do so with respect to almost all of the now-challenged statements. While we note defendant previously sought redaction of two of the now-challenged portions, which the court partially granted, defendant did not seek redaction for the remaining twelve that he now contends should have been omitted. We discern defense counsel's failure to properly and fully raise and preserve the issue reflected his intention to further defendant's theory that the police did not conduct a thorough investigation, one with which defendant repeated and emphasized throughout trial at every stage including during his opening statement, witness questioning, and final summation. In light of defendant's intentional choice to not object to these statements but actively rely on them to further his defense, we are satisfied the court did not abuse its discretion nor commit any error for that reason and the others noted.

---

[6] As noted, the portions of the interrogation for which defendant contends should not have been admitted exclusively concern the detectives' statements that they believed defendant was in New Jersey the night of Cantor's murder. Accordingly, we focus our analysis to this point.

A-1158-23

We also reject defendant's argument because it fails to consider the fact that New Jersey courts recognize the probative value that an officer's statement and a defendant's responses made during a custodial interrogation provide so long as the jury is properly instructed and those statements' probative value outweighs any prejudice. Our review of out-of-jurisdiction authority confirms that a majority of courts that have considered this issue have adopted a similar approach.

Indeed, courts in Missouri, Kentucky, South Dakota, Arizona, and Idaho have held that officers' statements during recorded interrogations, including opinions regarding guilt or credibility, are generally admissible to provide context to the defendant's responses or to explain the course of the investigation, especially when accompanied, as here, by a limiting instruction. See State v. O'Brien, 857 S.W.2d 212, 221-22 (Mo. 1993); Lanham v. Commonwealth, 171 S.W.3d 14, 27 (Ky. 2005); Allen v. Commonwealth, 286 S.W.3d 221, 225 (Ky. 2009); State v. Running Bird, 649 N.W.2d 609, 616 (S.D. 2002); State v. Boggs, 185 P.3d 111, 121 (Ariz. 2008); State v. Cordova, 51 P.3d 449, 455 (Idaho Ct. App. 2002).

Further, many of these jurisdictions, including Illinois, Georgia, Rhode Island, Nebraska, Michigan, and most recently Pennsylvania, require trial courts

46

to balance the probative value of such statements against their potential for unfair prejudice, and to provide limiting instructions where appropriate. See, e.g., Commonwealth v. Malcolm, 351 A.3d 703, 714 (Pa. 2026) (overturning Commonwealth v. Kitchen, 730 A.3d 513, 521 (Pa. Super Ct. 1999)); People v. McCallum, 144 N.E.3d 491, 503, 505 (Ill. App. Ct. 2019); Butler v. State, 738 S.E.2d 74, 81 (Ga. 2013); State v. Gaudreau, 139 A.3d 433, 449-50 (R.I. 2016); State v. Rocha, 890 N.W.2d 178, 199 (Neb. 2017); People v. Musser, 835 N.W.2d 319, 358 (Mich. 2013).

We nevertheless recognize a minority of jurisdictions have taken a more restrictive approach, excluding such statements even when made during an interrogation. See State v. Elnicki, 105 P.3d 1222, 1229 (Kan. 2005); State v. Demery, 30 P.3d 1278, 1284, 1288-89 (Wash. 2001). We note, however, these courts do not appear to permit the balancing of probative value and prejudice, do not allow for these statements to be admitted given a proper jury instruction, and do not recognize the contextual value of such statements in explaining the course of an interrogation. Here, the court: (1) gave defendant the opportunity to bring its attention to the statements he believed should be omitted, (2) subsequently considered the "prejudicial effect on the jury" as argued by defendant with respect to statements he raised at the motion hearing to decide

what should and should not be redacted, and (3) provided the jury credibility instructions throughout the trial, including "instructing [the jury] to disregard this witness's opinion as to whether or not [defendant] was being truthful or not" immediately after defense counsel purposefully elicited testimony from the detective regarding his statements. We are satisfied the majority approach adopted by New Jersey reflects a more pragmatic recognition of the realities of police interrogation and the need to provide the jury with a complete and accurate context for a defendant's responses, while safeguarding against undue prejudice.

We reach a similar conclusion regarding defendant's arguments that the court improperly admitted lay opinion testimony from Detectives Paxos and Love and conclude the court correctly admitted both Detective Paxos' testimony that she did not flag certain emails as concerning or threatening and Detective Love's testimony that a review of Cantor's computer data did not yield evidence of additional suspects. We are satisfied that the testimony is based on the witness's respective first-hand perceptions and further shed light on potential suspects, pursuant to the requirements of N.J.R.E. 701.

Further, and separately, we agree with the State that defendant invited this testimony in "direct response" to his noted trial strategy that police did not

properly investigate other suspects. State v. Medina, 242 N.J. 397, 413 (2020) ("[W]hen an officer provides reasons related to his or her actions in an investigation, the hearsay rule is not violated because the testimony is offered 'to show the officer was not acting in an arbitrary manner or to explain his subsequent conduct.'"). Indeed, the record indicates both witnesses' testimony was in response to a series of questions on direct examination concerning and explaining their extensive work during the investigation, for which defendant consistently alleged at trial was not thorough and did not consider other suspects. The context concerning why this testimony was elicited explains defendant's failure to properly preserve these issues at the time it was presented.

We also find unpersuasive defendant's reliance upon McLean to support his assertion that their testimony was not based on their rational perception. In that case, our Supreme Court concluded an officer's testimony regarding the defendant's alleged participation in a drug transaction as admitted at trial was an "impermissible expert opinion . . . because it was elicited by a question that referred to the officer's training, education, and experience." McLean, 205 N.J. at 463. Unlike the officer in McLean whose testimony concerned his opinion regarding the defendant's guilt primarily based on his training and prior experience, both Detectives Love and Paxos' testimony was expressly in

response to questions not based on their training nor experience but rather their first-hand observations of the emails and computer data that they personally observed as part of the investigation, a point with which defendant seemingly does not disagree. Branch, 182 N.J. at 351 ("the hearsay rule is violated if the officer states or suggests that some other person provided information that linked the defendant to the crime").

To the extent defendant relies upon Watson, 254 N.J. at 610, to support his contention that the court's decision with respect to Love and Paxos' testimony violated his confrontation rights, we disagree. Unlike the officer in Watson who suggested he possessed "superior knowledge, outside the record," in light of his conversation with an officer from a separate law enforcement agency, we are satisfied both sets of testimony before us were based on the witnesses' rational perception of the raw data underlying their opinion, not a conversation with an otherwise non-testifying declarant, and the fact that neither Cantor's emails nor computer data were admitted into evidence does not dictate a different outcome. Id. at 610-11.

IV.

In defendant's last point, he argues that Finkelstein's testimony regarding Cantor's demeanor and fear was improper hearsay that should have been

50

excluded. This hearsay, defendant argues, was not admissible under the "state of mind" hearsay exception because the victim's state of mind was irrelevant to whether defendant had the requisite state of mind to commit murder and cites to State v. Machado, 111 N.J. 480, 484-89 (1988); State v. Prudden, 212 N.J. Super. 608, 612 (App. Div. 1986); State v. Downey, 206 N.J. Super. 382, 384 (App. Div. 1986); and Benedetto, 120 N.J. at 252, to support his contention. Defendant further contends that even if the hearsay was properly admitted, it should have come with a jury instruction explaining the limited purposes for which it could be used. He maintains that this error, combined with the errors of the State's lack of direct evidence and improper opinion testimony, necessitates the reversal of his convictions.

We review a decision to exclude a lay witness's testimony for an abuse of discretion, as noted above. Sanchez, 247 N.J. at 465. This includes determinations to admit hearsay. N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 366 (2017) (citing Carmona v. Resorts Int'l Hotel, Inc., 189 N.J. 354, 379 (2007)). However, where a party fails to raise an issue below, a court will review that issue for plain error.[7] R. 2:10-2.

---

[7] We note defense counsel objected to Finkelstein's initial testimony responding to a question regarding Cantor's "demeanor and his reaction" to defendant's

As discussed above, fact witnesses may testify regarding what they "perceived through one or more of the senses." McLean, 205 N.J. at 460. A witness may testify to "observations that [a] defendant appeared aggravated at one point and was 'clearly upset'" because these are "opinions based on first-hand perceptions of defendant's appearance, demeanor, and reactions, which fall within the lay opinion rule." Tung I, 460 N.J. Super. at 101.

Hearsay is inadmissible at trial unless it falls under an exception provided by rule or law. N.J.R.E. 802. Hearsay is a statement "other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." State v. Byrd, 198 N.J. 319, 336 n.5 (2009) (quoting N.J.R.E. 801(c) (1993)). One such exception is a "statement made in good faith of the declarant's then-existing state of mind, emotion, sensation or physical condition." N.J.R.E. 803(c)(3). If the evidence is not a statement offered for the truth of the matter, the evidence is not hearsay and no exception is necessary. State v. Long, 173 N.J. 138, 152 (2002) (citing State v. Chavies, 345 N.J. Super. 254, 274 (App. Div. 2001)).

---

visits. After the State rephrased the question to solely focus on Cantor's "demeanor," Finkelstein testified that Cantor "was very upset and somewhat frightened and somewhat intimidated," to which defendant did not object. At no point did defendant reassert his noted objection or request a limiting instruction regarding the testimony.

Courts have ruled that a murder victim's statement of fear "should not be used to prove the defendant's motivation or conduct." Machado, 111 N.J. at 489. The Court "emphasized the prejudicial nature of statements evincing fear," however, it also "explained how some of the victim's hearsay statements might be admissible in a tailored form with the expression of fear redacted, so long as the probative value of the statement was not substantially outweighed by any remaining prejudicial value." State v. Calleia, 206 N.J. 274, 289 (2011) (citing Machado, 111 N.J. at 489-90). This is because in a murder case, the important factor is "the state of mind of the defendant, not that of the deceased." Downey, 206 N.J. Super. at 391.

However, Rule 803(c)(3) provides:

> A statement made in good faith of the declarant's then-existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

"Expressions of fear may be admissible when the victim's state of mind is a relevant issue." Benedetto, 120 N.J. at 260. For instance, a declaration "can be admitted 'to establish[] that the decedent was not the aggressor, did not commit suicide and was not accidentally killed,' provided that those matters

53

satisfy the relevancy requirement." State v. Scharf, 225 N.J. 547, 570 (2016) (alteration in original) (quoting Machado, 111 N.J. at 485). Statements can also be "admissible as background to establish the nature of the relationship between the victim and the defendant." Machado, 111 N.J. at 489. The basis for accepting hearsay testimony is that the "behavior of both the victim and the defendant are part of the mosaic of the criminal event, and hence, insofar as their declarations bear upon either the quality of their acts or a relevant state of mind, they must be accepted as part and parcel of the critical scene." State v. Baldwin, 47 N.J. 379, 394 (1966).

N.J.S.A. 2C:12-10(b) provides that "[a] person is guilty of stalking . . . if he purposefully or knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person to fear for his safety or the safety of a third person or suffer other emotional distress." The element of causing reasonable fear "means to cause fear which a reasonable victim, similarly situated, would have under the circumstances." N.J.S.A. 2C:12-10(a)(4). It "refers to persons in the victim's position and with the victim's knowledge of the defendant." H.E.S. v. J.C.S., 175 N.J. 309, 330 (2003).

To the extent defendant contends Finkelstein's testimony regarding Cantor's demeanor was prejudicial and inadmissible hearsay, we disagree and

conclude its admission was not an abuse of discretion, much less harmless or plain error. Because of the State's phrasing of the question, Finkelstein expressly did not testify to any specific statements that Cantor made about defendant's visits, and to the extent Finkelstein's testimony did introduce any hearsay statements, we conclude they would be admissible as a statement of a declarant's then-existing state of mind under N.J.R.E. 803(c)(3).

We reject defendant's primary contention that this testimony was not relevant in light of the elements required to convict a defendant of stalking under N.J.S.A. 2C:12-10(a)(4), a separate charge for which defendant was ultimately convicted, and the testimony's insight into the relationship between defendant and Cantor, for which defendant suggested was not tense or confrontational. As argued by the State, the testimony regarding his friend's demeanor following his interaction with defendant is relevant to defendant's statement to police that his visits to Cantor's house were "trivial" and that they had a long, civil conversation. Accordingly, we determine the admission of the friend's testimony was not abuse of the court's discretion nor plain error.

We further disagree with defendant's reliance on <u>Machado</u>, 111 N.J. at 482 (overturning court's decision to admit a letter written by the victim describing how she "felt [her] life was in danger" due to defendant); <u>Prudden</u>,

212 N.J. Super. at 612 (overturning decision to admit victim's letter alleging if "anything happens to [him] . . . , you can go get [defendants because] they would be the cause of it"); Downey, 206 N.J. Super. at 384 (same letter at issue as Prudden); and Benedetto, 120 N.J. at 252 (overturning decision to admit the victim's girlfriend's testimony regarding defendant's specific statements of fear from a conversation the night of the victim's murder). Unlike the evidence presented in those cases including the prejudicial and specific out-of-court expressions of fear from the victims, the disputed evidence before us concerns testimony regarding the victim's demeanor and was not solely relevant to establish defendant's motive, for which the State otherwise presented extensive evidence. Calleia, 206 N.J. at 291-92 ("A deceased victim's then-existing state of mind cannot directly prove a defendant's motive").

Finally, defendant's arguments that the court should have given the jury a limiting instruction regarding the use of state-of-mind hearsay fail because the statement was not inadmissible hearsay, and even if so, the lack of instruction regarding a fleeting line was not clearly capable of producing an unjust result. Accordingly, in light of the nature of the testimony, its relevance to the stalking charge, and its responsiveness to defendant's characterization of his encounters

with Cantor, we conclude the court did not abuse its discretion nor commit plain error in admitting Finkelstein's testimony.

To the extent we have not specifically addressed any of defendant's arguments, it is because we have concluded they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-1158-23